and I really don't want to talk about Supervisor Lease either, but if you get to that point, I'd be happy to address it with the Court. I would like to begin my argument with discussing the Bigger's analysis and discussing the initial in-court identification in this case, excuse me, mirroring the process of the Bigger's analysis. I'm not going to go into the details of the prior counsel's case, but this is in a slightly different context. The Court is aware of all the general legal principles that their admission of evidence derived from suggestive identification procedures can give rise to a due process violation. And what we're asking the Court to do here is apply Neil B. Bigger's, which is predicated on Stovall and Coleman and all the other prior Supreme Court cases, to an initial in-court identification procedure. And I believe there are several reasons why the Court should extend Bigger's to that situation. First, the real issue is whether this Court believes that an unduly suggestive initial ID procedure can be the basis of a due process violation. And I believe that there is a lot of case law on that point and that weighs in our favor. Well, we could agree with you on that, but here the teller had seen this fellow jump over the fence twice, and he was caught in the blue car when they had the accident. It seems to me there's very little doubt as to who this guy was and that he was involved. Well, there's two robberies to consider. Yes. There is the May 24th robbery and the June 14th. And that's why I refer to the fact he jumped over the fence twice. I guess the first time he jumped over it he tried to jump over it three times. Well, the only in-court ID and the only ID in this entire case of Mr. Aikens as the Jennifer Navarette, who was the witness who made the in-court identification, was from the May 24th robbery. What you're talking about, the apprehension of Mr. Aikens, did not come from the May 24th robbery. That was the June 14th robbery. So those are two separate events. And if the Court is in agreement that Biggers should be applied to the initial in-court ID and I don't need to go through Domina and Judge Schroeder's, I think, well-reasoned and persuasive dissent, I mean, I'm happy to go through that if the Court has questions as to why I believe. Well, what does Domina require us to hold on this issue, if anything? Well. I mean, it seems that in Domina we decided not to extend Biggers to this context. Well, exactly. And I think that Domina is distinguishable from this case for a couple of reasons. There was a ton of other evidence showing that. In Domina? In Domina, showing that the defendant was the robber in this case. Isn't there, to use your words, a ton of other evidence in this case? Well, there isn't. There may be on the June 14th robbery, but there really is not on the May 24th robbery. Aren't the two sufficiently similar so that one could be regarded as M.O. evidence with respect to identity on the other? Well, that's the question. The question is, the evidence against Mr. Aikens on the May 24th robbery is solely Ms. Navarrete's ID. And I have to talk about the ID because the ID is not a positive ID. It's an ID where she says, he looks similar to the robber in the eyes. That's the extent of her positive ID that the government argued. It was not a positive ID. And the belief by the other two tellers that Mr. Aikens was the robber on both occasions. But as I pointed out in my brief, there is wide disparity between the tellers about the two robbers. Ms. Rouse says that the robber's voice was disguised. Ms. Lucchesi says it wasn't disguised. Ms. Navarrete says it wasn't disguised. Ms. Rouse and Lucchesi say the robber spewed profanity. Ms. Navarrete says no profanity. We're talking about the May 24th robbery. Are you suggesting that the violation now of the in-court identification is constitutionally infirm because, A, it's – it was a weak identification and the rest of the evidence was uncertain? Well, I'm saying under the – if the Court is inclined to extend Biggers and look at the Biggers analysis, what we have is an unnecessarily suggestive ID where the defendant is the only male at defense counsel. But you're saying that the ID was – the ID itself was very qualified and susceptible to doubt. Exactly. Right. I'm saying that the – that the ID was unnecessarily suggestive, being the only African American male in the courtroom, being the only – But it wasn't positive, was it? Well, it was wishy-washy. It was he looked similar to the – to the robber in the eyes. So it was unduly suggestive to make somebody say he looked similar in the eyes. Well, what I'm saying is that if the Court looks at the Biggers analysis and looks at the circumstances of the ID and looks at the totality of the circumstances analysis, what we have here is a situation where an unduly suggestive identification An unduly suggestive possible identification. Well, the government certainly argued it as an identification in the record, and that he was identified by Ms. Navarette. And defense counsel did argue that he – that there wasn't a positive ID. Domina pretty much took on this issue and decided here's what we're going to do. And so now we have a case where everybody relied on Domina, and you're asking us after the fact to undo the whole thing and start all over again. Well – I mean, Domina is – seems to me to be the law of the circuit, and it ought to control in this case. And I would agree with that, Your Honor, as of right now. And I think defense counsel raised that big – the applicability of Biggers to the situation where the court was unaware of the argument that Biggers should be extended. But I would ask the Court to look at Domina, and I think to the extent that Domina is distinguishable, we've distinguished it. But by the same token, to the extent that Domina says that the abuse of discretion standard is the appropriate standard, I would proffer to the Court that Judge Schroeder's dissent is the better reasoned view as to why Biggers should apply. And I would – it's really the view that the Court should agree with. I'm sure Judge Schroeder would agree with you. It's not the law of the circuit. Right. Well, I'm asking the Court to take a look at that again. Well, how can we? You want this to go in bank, or what are you suggesting? That we – you're suggesting that we should overrule Domina as a three-judge panel? Well, you know we can't do that. We can't do that. I'm asking the Court to – We're arrogant, but we're not that arrogant. I'm asking the Court to determine that the abuse of discretion, to the extent that Domina applies, I think is distinguishable from this case. But I'd also suggest to the Court that we're looking at a due process situation here, and that's a constitutional violation. And in this context, the idea that an out-of-court, unduly suggestive identification is subject to Biggers' protection, but the same exact identification procedure in court, which is even more unduly suggestive. We have the only black person in the courtroom. We have the only male at the fence table. We have the defendant sitting right next to his attorney. It doesn't get any more unduly suggestive than these kinds of circumstances, and it's compounded by the isolation as Mr. Aikens being the only black person in the courtroom. Didn't Rouse and Lucchesi testify that the same person was the robber on both occasions? I'm sorry? Didn't Rouse and Lucchesi both testify that it was the same robber on both occasions? They testified to their belief. Neither of them could identify Mr. Aikens as the robber from either the May 24th or the May 24th. But they could identify the robber as the robber, and they did. Then the question is who was it, but they said it was the same person. They said it was the same person, but I think we've pointed out, I point out in the brief that their testimony is really all over the place on this point, because they say that the May robber ordered everyone down on the floor, the June robber did not. The June robber smelled of alcohol, but the May robber did not. There was no testimony that the words used by both robbers were similar. They're the witnesses. After 23 years of handling these cases, had they all agreed on every point, then I would have been suspicious. They rarely agreed on everything. The fact that they're all over the lot is standard operating fair for these cases. Except that they had no basis to believe that the robber was the same person other than their belief that they had been robbed three weeks earlier. And when pressed on cross-examination, they couldn't point to a voice. They couldn't point to anything, in effect, that identified the robber as the same. It was their belief, and they stated their belief in their examination, that it was the same robber. But when pressed on voice, when pressed on the actions, when pressed on did he make everybody go down on the floor. It's kind of corroborated by everything else in the case, though, isn't it? What is, Your Honor? The idea that it was the same guy on both occasions. Well, I don't think that there's even a sufficiency of evidence on the first robbery on the May 24th. Without Ms. Navarrete's identification of the May 20th, that's the evidence. The evidence is this sketchy identification in court in these unduly suggestive circumstances and the teller's belief, without more, that it was the same man from June 14th and May 24th that could not be identified by either teller. Well, was there sufficient evidence for the jury to conclude that it was the same individual? Was there sufficient evidence? That's what we're really looking at. Well, on the sufficiency question, yes. But what I'm talking about in terms of the unduly suggestive. Well, but let's get to this, that there was enough evidence for the jury to believe it was the same guy who did both robberies. I would contest that point. Okay. Now, the guy in the blue car turns out to be the fellow we got there at the defense table. Correct. But that's the June 14th robber. That's... Well, we've got to go, if it was the same robber who did both and he's caught for the June 14th robbery, then you're beginning to have enough evidence put together. And when the first teller talks about identification in the courtroom, she's very careful. She says, well, the eyes seem to be the same, but you can then tell the, you know, the jury could say, well, that wasn't really a sufficient identification. I don't see that we've got a real problem about identification here, counsel. I would suggest to the court that the certainty of the ID is critical in this case. Because the more certain a witness is of an ID, the more likely it is that the unduly suggestive circumstances have not influenced the identification. Well, why do you draw that in front? Well, Biggers says that. And it's more likely that if a person says, as the witness said in Biggers, I know that guy, I know him anywhere, I sat with him, he kidnapped me for three hours, that is a factor to be weighed in the favor of upholding such an identification and finding the identification reliable despite the unduly suggestive nature of it. The second robbery almost seems to be a carbon copy of the first if you look at the evidence. I mean, that's what the witnesses say, too. I mean, the spontaneous statement in the 9-11 call is the same guy just robbed us again. Right. As I said, the witnesses say it is their belief. But I think in the brief and throughout that there is a huge distinction between the first robber and the second robber and that the belief of the tellers is not substantiated by the evidence. Same gun, same mask. I mean, the whole show right down the line. Let's suppose there had been no ID at all. Suppose she had not been able to identify robber number one. So instead of having, well, I think it might be, he looks similar eyes. I can't tell. So there's none. So would the first conviction, the conviction for the May 24 robbery then have necessarily to fall out for lack of substantial evidence? I believe so. I believe the only evidence of the May 24th robbery is the teller's belief that it's the same guy and Ms. Navarette's sketchy ID. And, you know, I don't believe it's sufficient with those two pieces of evidence with a fair review of the record. Lucchesi testified trial. She knew it was the same person, same voice, same verbiage, same style, same mannerisms, same actions. Rouse gave similar testimony, same mask, same glove. I'm positive it's the same gun. I mean, on and on and on. Same mask, gloves, dark clothing, jumped over the fence at the same place, pointed his gun at the same clerk both times. I mean, you talked earlier about a ton of evidence. It seems to me that this is one of those tons of evidence cases. Well, I would suggest if the Court would look at the factual distinctions we make in the brief about Ms. Rouse and Ms. Lucchesi and Ms. Navarette's robbery and the distinctions between the May 24th robber and the June 14th robber, that there is – there are various inconsistencies that are not minor. There are major inconsistencies. We'll do that. And I'd like to move to the Daubert issue on the fingerprints. And I'm assuming the Court, we can skip over the timeliness issue and we're going to talk about the gatekeeping, the failure to... The screening ahead of time. The district court's failure to discharge the gatekeeping function. Right. Now, you brought this up when Judge Pollack's opinion was out there where he had thrown out the – he declared fingerprint evidence unreliable generally. And then amidst of all of these proceedings, he reversed himself. Correct. So I take it that affected the dynamic of what we're looking at. I think it did. I mean, I wasn't trial counsel in this case. Okay. But I believe from reading the record that it did. But in this case, as the Court's aware, defense counsel made a Daubert motion, made a request, and the Court denied it as untimely. But – and also stated that it would not exercise in the first instance the gatekeeper function. And instead allowed some opportunity during the trial? Correct. Well, what's critical, I believe, in this analysis is that it did – the Court did not, as an aleatory, allow a preliminary assessment. What the Court allowed was defense counsel, after the witness had been qualified as an expert, after the witness had rendered his expert opinion that the print on the evidence was in on direct examination, to cross-examine him regarding Daubert issues, and that the government is of the opinion that that after-the-fact inquiry is sufficient to fill the Court's gatekeeping function. Well, I can't find any objection to the fingerprint expert's testimony. Was there an objection, or was the – It was contained in the Daubert motion, which is in the excerpts of record in its entirety for the Court. And said, we object to the fingerprint testimony? And objected to it on a variety of scientific bases. Objected to it on a – on a – I think there's seven or eight specific points that – But then at trial there was no objection. So you're relying on the earlier objection in connection with the Daubert motion? Yes, which was denied. And then there was no cross-examination at trial on the issue of the reliability of fingerprint evidence? That is correct. The defense counsel opted not to cross-examine on the Daubert issues after the testimony of the expert. And what does that mean? Well, you know, I guess that's a strategic decision by defense counsel. Perhaps defense counsel didn't, you know, it's kind of like closing the barn door after the horse has escaped. The Court's obligation – there's not a case anywhere that says that an after-the-fact Daubert inquiry is sufficient to fulfill the Court's gatekeeping function. There's not a case. Alitore says, you know, we're not going to tell you how to do it, but it's got to be before, and the fact that you did it before the witness testified and the procedure that you adopted and the methodology you adopted, it's a little out of the norm because it's not done in an unlimited context. But the Alitore court upheld the district court's using voir dire and out of the presence of the jury and permitting defense counsel to make whatever objections on the record prior to the witness testifying. In this case, the Court specifically said, I'm going to let the witness testify, and any objections you have will be after the fact. And what our position is, is that the case law requires the district court to make that reliability determination before the witness testifies, and that there's not a case anywhere that can be cited that permits the after-the-fact perfunctory inquiry to be sufficient to fulfill the Court's gatekeeping function. And I suppose really the issue that comes up at this point is the harmless error issue, and that what is the error, and that is it an error that affects substantial rights. And I would submit that the fingerprint evidence is the only evidence indicating that the defendant, as opposed to his co-defendant, who was also picked up in the vehicle, was the actual robber. And so in that context, it's also the basis for his sentence. He received a 25-year sentence on the first gun count and a consecutive 7-year sentence on the second gun count. So it certainly has, I believe, affects substantial rights and is an error that should be reversed. And I will save the balance of my minute and a half unless the Court has any further questions. Kennedy. Could I just ask you a quick question? You said there's no authority that justifies post or after-the-fact. What's your closest authority that says it has to be done in this kind of case before? Well, 104A, Federal Rule of Evidence 104A says it's a preliminary assessment. Daubert says it's a preliminary assessment. Every case that talks about it talks about it as being at the outset and describes it as screening the evidence. There is no case law that indicates whatsoever that it's an after-the-fact inquiry.  Thank you, Your Honor. Good morning. My name is Kessley Stewart for the United States. I have just a few points to make on the in-court I.D., and then I will move on. But the first is that the defendant was not the only black man in the courtroom. There were two others, and, in fact, one of them was bald. This is at the government's excerpt. Where were they sitting? They were in the spectator's section? They were. They were not in the well of the courtroom, but they were in the courtroom. And they were visible? They were visible. Where in relation to the witness? You say they're visible. I can't see the person in the gallery behind you because you're blocking me. Where is the evidence that they were visible? I can't actually provide you that. The record at government's excerpts of record 134 to 135, however, shows that the witness could see them. And I can read that to you. At the bottom of the government's excerpts of record, page 134, the government asks, Ms. Navarette, counsel asks you questions with respect to whether or not there are any other African-American males other than the defendant in the front part of the courtroom. Are there not? Answer, I'm looking at the jury. Question, looking at the whole courtroom. Answer, looking at the whole courtroom, there is more than one. Question, and in fact, there is a bald African-American male in the courtroom. Is that correct? Answer, yes, there is. Question, you described the robber on the day of the robbery as being bald. Is that correct? Answer, yes. Well, that doesn't establish that she saw them. I mean, the argument, it may be when she saw them, but isn't the argument, and doesn't Domina, in fact, acknowledge it, is that when asked that question, the natural inclination is to look to the defense table. And that could screen out her consideration of anybody else in the courtroom, just going there and thinking she's being asked to identify that person. A proper question, if it wanted to call attention to the possibility that anybody in the courtroom might be, would have said, looking throughout this entire courtroom, including wherever people are visible to you, do you see? That wasn't the nature of the question, was it? Well, the questioning was very open-ended. There was no pointing. There was no singling out the defendant. At the government's excerpts of record, page 87, the questioning proceeds, question, if you were to see this individual again today, would you be able to recognize him? Answer, yes. Question, do you see that individual in the courtroom today? Take your time. Ms. Navarette, do you see the person in the courtroom today? Answer, I can't say for sure. He does look similar. Question, when you say, quote, he does look similar, end quote, who are you referring to? Well, that implies what most people do, watch television, would assume. You look at the defense table. Sure. You'd agree with that. Sure, I would. And the defense counsel did a very good job of cross-examining the witness on that very point and arguing it in closing. I understood. But the fact you opened with the notion that there are other African-Americans in the jury, excuse me, in the courtroom, I have trouble crediting, putting much weight on that in terms of evaluating whether it's unduly suggested, because I think, as our case law recognizes, the natural inclination is to look to the defense table. So unless specifically directed to consider everybody in the courtroom, in other words, educating the witness, not just take your time and is there in the courtroom, it's hard to say, well, that cures the problem, that we should give any weight to the fact that there may have been some others. I don't, I don't. She apparently, from what you've read, wasn't exactly focused on until it was called to her attention. I don't disagree with the court, and that's why it wasn't included in the government's brief. I pointed out only to. Thank you. I appreciate it. And unless there are additional questions on that issue, I would move on. With respect to the Daubert discussion, I would just like to touch on counsel's argument that this was not harmless. And ask the court to look at the back of the government's excerpts of record at page 297. There's actually a picture of the blue car after the crash, the getaway car that included the two, the driver and Mr. Aikens. And you can see the gun there on the dash, on the passenger side of the car, wedged up against the dashboard. And the defense, the government argued that that, the placement of that gun is consistent with Officer Holder's testimony at trial, that he saw Reginald Aikens get out of the passenger side window of that blue car, that as he was getting out, he had the blue bag over his right shoulder, and that the rest of his body was sort of inside the car as he was getting out with the bag outside. And Officer Holder identified Mr. Aikens and identified the gun as being in the location where he found it in the car. All of that shows that this print really only proves that Reginald Aikens touched the gun, and that's exactly what the defense counsel argued. And in fact, the defense counsel argued that that was evidence that this was not the robber, because the tellers were pretty consistent that the robber held the gun to their head with their right hand. Do you think that we should have a rule to make it explicit that in a, since fingerprint evidence is common in cases that we should require, as counsel is inviting us to do, a rule that says that the Daubert hearing in fingerprint evidence must occur as part of the gatekeeping function before the witness is allowed to testify? The government would not advocate such a rule, especially in the context of fingerprint evidence, which has historically been admitted in court and considered reliable. That would be actually an onerous interpretation of the district court's Daubert requirements. The case law suggests that the district court should have flexibility and discretion in ensuring reliability, and the district court did do that here. So I think such a finding would not be appropriate, especially in the context of fingerprint evidence. Have you read the Prime case? I have read it, although I'm not sure I remember the case. Well, it's a Daubert case about the admissibility, whether there's a global determination that fingerprints are admissible or whether in each case there's the possibility of a Daubert hearing based on the evidence in that case. And Prime concludes that in each case a Daubert hearing is possible, even though 16,000 other courts have decided that fingerprint evidence in those cases can be admitted. But here on this fingerprint thing, it appears to me that the Daubert challenge was denied as untimely. Is that what happened? That is correct. And the way I read the record, it actually came in after the jury was selected. Is that right? That may be correct. I would have to check. It was four days before trial was set to begin that the Daubert motion was filed. I'm not sure whether it was before the jury was selected or not, but it should be you should be able to tell from the government's brief. Well, I went over this again just to make sure, and it appears that the reason and Your Honor denied the motion of request for hearing for reasons that it was untimely filed, and it was very untimely filed. That is correct. And then he said, but I'm not going to preclude you from attacking this in any way you want when the trial goes down. That is correct. The defense attorney prior to trial filed a motion to vacate the trial date one week before trial, and she explained that she wanted to make a decision. If the fingerprint evidence was a positive, if her expert concluded that there was a positive identification, she wanted to challenge the reliability of the methodology. If, however, her expert concluded that there was not a match, then she would argue that at trial. Did her expert testify? Her expert did not testify. She did not put on any witnesses. Was all the information made available to the defense's expert? Yes, all of the information was made available. But late. I think that was the problem, right? It was the San Francisco Police Department. Processing was slow. That is correct. The defense counsel had been provided with a number for the FBI agent, but because her expert had contacts with the police department, chose to go directly through the police department and had trouble and didn't notify the government or the court until a week before trial. Basically, a jury had been, the decisions the court made with respect to the motion, which it did consider to be untimely, was that basically a jury had been selected, that a trial date had been picked some months ago. That is, I'm not certain, but that makes sense because I know the jury was selected about four days before opening statements. I further found that a delay in the case wasn't warranted because of calendar considerations. I emphasize that you would be entitled in your cross to explore all of what I consider to be Daubert issues, and that is science accepted. Whatever those issues are under Daubert and Kumho, you'll be entitled to use that by way of cross. You also have an expert, as you stated. That expert will be permitted to explore those areas as well. So the judge says, go ahead. That's correct. And then nothing happened, as far as I can tell. That's correct. In fact, when the government turned the witness over to the defense, the defense counsel asked questions about the placement of the print and about why there might not be prints on the bottle, et cetera, et cetera, but did not ask any questions with respect to the reliability of the methodology. And the district court actually sort of checked in with defense counsel and said, are there any other questions? Even the court asked a few. And then after defense counsel said no, the court decided to do it itself, turned to the witness and asked questions eliciting information about the reliability of fingerprint methodology. I have nothing further unless the court has questions. No, thank you. Thank you. I just have a couple of quick comments, and I think I can make the timeline clearer for the Court in terms of the Daubert motion. March 4th, defense makes a motion to vacate the trial date based on the fact that the defendant's fingerprint expert was not given access to the evidence by the SFPD crime lab, and there's a representation made that the request for access had been made more than four or five weeks before that. On March 5th, there's a pretrial hearing where the issue is exhaustively discussed and the court said it understood the defense's need for the expert opinion before filing the Daubert challenge, and the court ordered the government to make  That's on March 5th. On March 6th, there was a letter from Ms. Stewart to defense counsel, and the defense expert accessed the evidence late that afternoon. On March 7th, the defense counsel filed the lengthy in limine motion to exclude the fingerprint evidence. On March 8th, there was a telephone conference where the district court denied the motion as untimely, and on March 11th, after jury selection, the court permitted counsel to put the issues that were resolved on March 8th on the record. And that is, I believe, borne out in the record below. Borne out in the transcript. In the transcript. Yes. In both my excerpts of record and Ms. Stewart's. No, I'm confirming. I've read it. Yes. I want to make sure. The acquirer was very careful to let everybody make a record as to what had gone on. Okay. I would also just comment briefly, I realize my time is running, that the    I'm sorry. I'm sorry. I feel pushed. Okay. I always get nervous when the red light goes on. I'm sorry. That both Dalbert, Kumho-Tyer and Velardi, the Tenth Circuit case that reversed on the Dalbert issue, you know, acknowledged the great latitude that a district court has in making a Dalbert reliability determination. But the discretion in choosing how to make the reliability determination is not the discretion to abandon the gatekeeping function altogether, and that's what the district court did. You're arguing that you can never deny a Dalbert motion as untimely in connection with exercising the gatekeeper function? I'm saying that any time a party challenges and makes a request, I think that the The Court could have said, I'm not going to raise all the 30,000, you know, scientific issues and all the treatises that you have put forth as to the unreliability, but I'm going to fulfill the gatekeeping function and make a preliminary assessment on the record as to this expert's qualifications, this expert's methodology, and make that determination pursuant to FRE 104a. And you could have done it, what, in a voir dire? Voir dire. The Court could do it out of the, you know, out of the presence of the jury. And Alitore said you can do it in the presence of the jury, but you just have to do it beforehand. Did they – did defense counsel request that during the trial? I'm denying your motion as untimely. The defense counsel said, okay, you've denied it as untimely, but now it's a question of the admissibility of the evidence. Let's do it now outside the presence of the jury. I didn't see anything. Well, I think if the Court looks at – I have it in the excerpts. If the Court looks at the quote from the Court, the Court said, like, I'm not, you know, he was very clear about his determination. I read it, but I mean, my question is, did the defense say, all right, now I'd like outside of the presence of the jury to examine this expert? I don't think she made that specific request, but in the colloquy with – She didn't make that request at all that I could see. Right. But in the colloquy with the Court, she pressed the Court about what he was denying. And the Court said what prompted the Court at my excerpts of Record 62 is saying, look, I'm not dancing around it here. Here's what I'm saying. I'm denying in the first instance the gatekeeping function. That implicitly he understood was her request, that he – that he makes some kind of reliability determination. As you said, you could deny one of these things as untimely, but then nevertheless you still have to go through the process. And I'm just asking if anywhere did the defense attorney ask for that, to go through the process? Because what it looks like to me is the defense attorney looked at the print, told counsel the print's good, and that was the end of it. I mean, it seems if any – if it's an error at all, is it subject to harmless error? I mean, because defense counsel just then walked away from the opportunity to attack the reliability of fingerprint evidence. Right. And I think that's the issue, to be quite frank with the Court, is what – what – it is an error. It is the Court should have – have screened the evidence. The Court should have fulfilled the gatekeeping function. Oh, right, yes. But the question is whether in this context it was harmless or not. And my argument on that point is pretty limited, which is that this print and the identification of the print is the sole evidence that links my client to this weapon. And as such, it affects his substantial rights. But that's really the only argument I can make on a harmless error basis in good faith at this point. But if I could also just raise one other issue that I really meant to address with the Court. I got kind of very focused on the Biggers issue, but I also wanted to address the argument very briefly that even under Lumitap and Bordeaux and Domino, in this case, there was an abuse of discretion in permitting this unduly suggestive ID. And I won't go over too much, but in Lumitap the Court found there wasn't an abuse of discretion because the Court took preventative measures to make sure what the witness recollected. In this case, the Court took no such preventative measures. And then I think even under the Lumitap, Domino, Bordeaux line of cases that there was an abuse of discretion in permitting Ms. Navarrete to make the in-court initial ID. Thank you. Thank you, Counsel. Thanks to both of you. The case just started. Thank you both. Is order submitted? You want to take a recess or keep going? Keep going? Keep going? We might as well take a quick break. We've got two minutes. All right, we'll take a ten-minute recess before hearing the next two cases. Thank you, Counsel. Thank you.
judges: B. Fletcher,trott, Fisher